UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                      09 CR 168 (RPP)

        - v. -                         **OPINION AND ORDER**

HENRY FRANKLIN,
  ALSO KNOWN AS "BT",

                        Defendant.
------------------------------------------------------------X
**ROBERT P. PATTERSON, JR., U.S.D.J.**

      On January 14, 2011, following a trial that began on January 10, 2011, the jury

returned a verdict on a three count indictment brought by the United States against

Defendant Henry Franklin.  The jury's verdict acquitted Mr. Franklin on two of the three

counts: 1) distribution of cocaine or possession with intent to distribute cocaine and 2)

distribution of cocaine base (crack cocaine) or possession with intent to distribute cocaine

base (crack cocaine).  The jury convicted Mr. Franklin on the remaining count of

conspiracy to distribute and possess with intent to distribute mixtures and substances

containing a detectable amount of cocaine and 50 grams or more of mixtures and

substances containing a detectable amount of cocaine base (crack cocaine) in violation of

21, U.S.C. §§ 846, 812, 841(1)(a), 841(b)(1)(C), and 841(b)(1)(A).

      On January 28, Mr. Franklin filed a motion seeking a judgment of acquittal

pursuant to Fed. R. Crim. P. 29, or in the alternative, a new trial pursuant to Fed. R. Crim.

P. 33.[1]  On February 10, 2011, the Government responded in opposition.

---

[1] Defendant also moves for a new trial pursuant to Fed. R. Crim. P. 34, but Rule 34 is facially inapplicable
to this case, and Defendant does not make any arguments related to Rule 34 in his brief.  Therefore his
motion will be considered to be pursuant to Rule 33 alone.

Defendant urges a judgment of acquittal or a new trial on several grounds: 1) that the jury's finding of a conspiracy involving more than 50 grams of cocaine was inconsistent with their acquittal on the count of possessing with intent to sell 50 grams of crack cocaine and is therefore irrational;[2] 2) that because Mr. Franklin was acquitted of the "overt acts" involved in the conspiracy, his conspiracy conviction should be dismissed as well; and 3) that the government only proved Mr. Franklin was a facilitator between a willing buyer and seller, which, Defendant claims, is insufficient for a conviction on a drug conspiracy under United States v. Hyoshion, 448 F.2d 343 (2d Cir. 1971) and United States v. Tyler, 758 F.2d 66 (2d Cir. 1985).

The Government first contends that the validity of the Defendant's conviction is not affected by the jury's decision to acquit on the other counts.  Second, the Government argues that the conviction was supported by abundant evidence.  Finally, the government argues that the "buyer-seller" rule proposed by Defendant is inapplicable to this case.

I.      Evidence Presented at Trial

Defendant's motion hinges on the sufficiency of the evidence presented at trial, summarized below.  The Government's evidence primarily consisted of live testimony of law enforcement agents as well as recordings made by an undercover agent of two drug transactions that occurred on March 13 and March 20, 2008.   These drug sales were arranged by law enforcement through the use of a confidential informant.  The Government also introduced the drugs purchased into evidence.

---

[2] Insofar as the Defendant is relying on the conspiracy count alleging a conspiracy to distribute or possess with intent to distribute more than 50 grams of cocaine being inconsistent with the jury verdict acquitting the Defendant of distributing or possessing with the intent to distribute 50 grams of crack cocaine, the motion is denied, because the conspiracy count also alleged a conspiracy to distribute 50 grams or more of crack cocaine.

A.  <u>Testimony of Gaetano La Mazza</u>

The Government's first witness, Gaetano La Mazza, is a detective with the New York City Police Department ("NYPD") where he is assigned to the Bronx gang squad. (Trial Tr. at 26.)  In 2008, Detective La Mazza was involved in a drug trafficking investigation of a gang operating in the vicinity of the 46th Precinct in the Bronx.  (<u>Id.</u> at 27.)  This investigation targeted an individual named Harrison Brown, also known as "H."  (<u>Id.</u>)

Detective La Mazza testified that, in conjunction with this investigation, the police used a paid confidential informant and in June 2007, that he instructed the confidential informant to arrange a drug deal with "H" for one of the undercover officers, who would be the purchaser of the drugs.  (<u>Id.</u> at 28-30.)  Starting in September of 2007 and continuing until March of 2008, the informant was able to arrange seven or eight drug transactions.  (<u>Id.</u> at 31-32.)  In order to arrange these transactions, the informant would call "H", who would then advise who was going to do the deal.  (<u>Id.</u> at 33.)  The following day or a few days later, the undercover officer would arrive at an agreed upon location and conduct the transaction with whoever would deliver the drugs and collect the money.  (<u>Id.</u>)

i.      <u>March 13, 2008</u>

Detective La Mazza testified that, on March 13, 2008 around 10:40 a.m., the informant called "H" through a push-to-talk phone, in Detective La Mazza's presence. (<u>Id.</u> at 34, 42.)  This phone had a speaker function, and through this function Detective La Mazza was able to hear both sides of the conversation and the details of the call were

recorded.  (Id. at 34)  This recording was played for the jury, and consisted of a

conversation between the confidential informant ("CI") and Harrison Brown:

| | |
|---|---|
| BROWN: | Yo |
| CI: | So, everything's good to go?  I'm about to be up there in like twenty minutes. |
| BROWN: | [U/I] You know what I mean? [U/I] He should be on his way. |
| CI: | Alright |
| … | |
| CI: | You spoke to him though?  You told him, you told him my situation? |
| BROWN: | What you mean? |
| CI: | For the, um, home boy waiting and all that. |
| BROWN: | Yeah, yeah, yeah [U/I]  You see what I mean?  That's why I got on [U/I] this morning.  So when you hit me [U/I] so, you know what I mean? So I'm going to write back right now to make sure. |
| CI: | Alright, we'll be at your door at 11, man. |
| BROWN: | Alright. |

(Govt. Ex. 201T at 1-2.)

After this call, the undercover officer and the confidential informant traveled to

the buy location at 1705 Andrews Avenue in the Bronx.  (Trial Tr. at 46.)  Detective La

Mazza drove to a location near 1705 Andrews Avenue, as a member of the "field team"

of law enforcement professionals.  (Id. at 46.)  The field team was positioned around the

perimeter of the buy location so that they could intervene in the event of an emergency.

(Id.)  Later that day, the undercover officer, the informant and Detective La Mazza

reunited at the 48th precinct.  (Id.)  There, the undercover officer showed Detective La

Mazza a clear plastic bag containing a white rocky substance that he believed to be

powder cocaine.  (Id. at 47.)  Detective LaMazza testified that he had expected the

undercover officer to have crack cocaine after the transaction, instead of powder cocaine.

(Id.)

Detective La Mazza testified that, following the transaction, a second call took place at 12:15 p.m. that day in Detective La Mazza's presence between the informant and "H." (Id. at 48-49.)  This second call was also played for the jury.

| BROWN: | Yo. |
|--------|-----|
| CI: | Yo, you still outside?  You aint gotta, um, you aint't gotta chef that.  That's alright. He's going to do it.  Alright? |
| BROWN: | Alright.  What time you want to meet and let me tell you [U/I] because that's, that's the whole thing [U/I] my crib.  [U/I] You know what I mean?  That's why I do it like this. |

(Govt. Ex. 201-T2 at 1.)

Detective La Mazza testified that "cheffing" means cooking, or the process used to turn cocaine into crack cocaine.  (Trial Tr. at 51.)

At the 48th Precinct after the sale, Detective La Mazza showed the undercover officer and the informant a book containing photographs of 23 subjects of the investigation.  (Id. at 56.)  The undercover officer pointed out a picture of Mr. Franklin as the person from whom be purchased the cocaine.  (Id.)

    ii.    <u>March 20, 2008</u>

On March 20, 2008, Detective La Mazza was involved with a second purchase of narcotics arranged by the confidential informant and made by the undercover officer.  (Id. at 58.)  As with the first purchase, this buy was initiated through a phone call placed by the informant to "H." (Id.)  This call was made in Detective La Mazza's presence and was played over speaker phone so that Detective La Mazza could hear both sides of the conversation.  (Id.)  This call was also recorded:

| BROWN: | Yo. |
|--------|-----|
| CI: | Yo, you spoke to BT? Everything a go?  Ain't nothing going to be like before, right?  Everything a go? |

BROWN:          Yeah, yeah, yeah, I was just talking to him earlier, I'm going to call him right back 'cause [U/I] still ready?

CI:             yeah, we are on our way back right now.

BROWN:          Alright.

CI:             So I should be on the block by like, 12:30, you heard?

BROWN:          Alright, say no more.

(Govt. Ex. 203-T at 1.)

For this transaction, the undercover officer and the confidential informant were to purchase narcotics in the vicinity of MacComb Road and Featherbed Lane in the Bronx. (Trial Tr. at 63.)  Once again, Detective La Mazza was a member of the field team positioned around the perimeter of the buy location.  (Id. at 62-63.)

About three hours after the undercover and confidential informant left the precinct for that location, they returned to the precinct parking lot, where they met Detective La Mazza.  (Id. at 63.)  The undercover showed Detective La Mazza a bag that appeared to contain crack cocaine.  (Id.)

Detective La Mazza testified that Henry Franklin was arrested almost a year after these events on March 6, 2009.  (Id. at 64.)

On cross-examination, Detective La Mazza explained that the confidential informant who arranged these transactions had been arrested in 2006 for heroin possession and being in the park after dark.  (Id. at 82.)  Detective La Mazza testified that the informant pled guilty to those charges, and then agreed to serve as a confidential informant in exchange for money payments.  (Id. at 83.)  Detective La Mazza testified that he met with this confidential informant two or three times per month, depending on what information the informant had to offer.  (Id. at 84.)  He further testified that the

6

confidential informant was paid a total of approximately $3,000 by the NYPD, and was also paid by the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives and the Drug Enforcement Administration.  (Id. at 85-86.)

On cross-examination, Detective La Mazza acknowledged that prior to March 13, 2008 there were a number of drug purchases arranged by the confidential informant via phone calls to "H" at which Henry Franklin was not present.  (Id. at 91-92.)  He further acknowledged that the detectives did not actually confirm, via surveillance or by tracking the phone number, that the individual on the other end of the informant's phone through which the sale arrangements were made, was in fact "H".  (Id. at 94.)

Detective La Mazza did acknowledge that the first sale on March 13 resulted in the purchase of cocaine and not crack cocaine.  (Id. at 100.)  Detective La Mazza explained that to his knowledge the informant had made a specific request for crack cocaine, but powder cocaine was what was ultimately provided.  (Id. at 100-101.)  Detective La Mazza explained that following the first sale, the confidential informant indicated that "BT" was the person who conducted the sale.  (Id. at 102.)  The name BT had arisen in conjunction with the investigation prior to March 13, but upon the confidential informant's return from the March 13 sale, the informant also provided BT's "government name," Henry Franklin, to Detective La Mazza.  (Id.)

Detective La Mazza also admitted on cross examination that at the time of his arrest, Mr. Franklin was not found with large sums of money on his person, and that a search warrant was executed on Mr. Franklin's residence, and neither drugs nor large sums of cash were found.  (Id. at 109.)

On re-direct examination, Detective La Mazza testified that in his experience it is not uncommon for one person involved in a drug transaction to "take the order" and for another person to actually deliver the drugs.  (Id. at 115.)

B.   Testimony of Bryan Digirolamo

The next government witness was Bryan Digirolamo, who is a special agent with the Bureau of Alcohol, Firearm, Tobacco and Explosives (the "ATF").  (Id. at 123.) Special Agent Digirolamo was assigned to the Bronx gang squad with Detective La Mazza.  (Id. at 124.)  Special Agent Digirolamo explained that the ATF paid the confidential informant in this case a "subsistence" payment covering his cab rides, phones, and other expenses.  (Id. at 125.)  Generally the informant in this case was paid about $100 a day, and the amount did not vary depending on what result was obtained as a consequence of any information the informant provided.  (Id. at 126.)

Special Agent Digirolamo testified that in early 2008, the ATF provided the informant with a digital recording device and showed the informant how to use it.  (Id.) He instructed the informant to try to record any conversations he had with the targets of this investigation.  (Id. at 127.)

i.     March 13, 2008

Special Agent Digirolamo testified that he was present and heard both sides of the March 13, 2008 telephone conversation between the confidential informant and "H" in which arrangements were made to purchase crack cocaine.[3]  (Id. at 130.)  Agent Digirolamo explained that the gang squad was seeking to buy 100 grams of crack cocaine

---

[3] Agent Digirolamo testified that he interviewed Harrison Brown ("H") after Mr. Brown's arrest in March of 2009, and shortly after that interview compared his voice to the voice on the recorded phone calls, and determined that it was the same person.  (Tr. at 130-31.)

because "H" was a "higher guy" in the organization who only sold higher quantities of drugs.  (Id. at 132-133.)  He testified that during the purchase on March 13, Special Agent Michael Patrick was to serve as the undercover officer, and he would wear a Kel recording device, which is both a recorder and a transmitter.  (Id. at 134.)  During the sale, Agent Digirolamo was positioned north of the buy location at 1705 Andrews Avenue.  (Id. at 135.)  Agent Digirolamo listened to the transmissions from the Kel recorder during the sale, and was able to hear the counting of money over the device, and to discern that multiple people were involved in the transaction.  (Id.)  When Agent Digirolamo returned to the precinct after the purchase was finalized, the Agent Patrick was there with a package of rock-pressed powder cocaine, not the crack cocaine they intended to purchase.  (Id. at 136.)  The officers then arranged for the informant to call "H" to complain that they did not receive crack cocaine.  (Id. at 137.)  Agent Digirolamo listened to this call, and heard "H" indicate that he could "chef it up," or turn the cocaine to crack for them.  (Id.)  After that call, however, Agent Digirolamo's supervisor decided he was not comfortable with returning the drugs to "H" to "cook up" the cocaine, so they decided to keep the cocaine.  (Id.)

      ii.       March 20, 2008

As to the March 20th transaction, Agent Digirolamo testified that the narcotics purchase made that day was again arranged through a phone call from the confidential informant to "H."  (Id. at 140.)  Once again, the plan was to buy 100 grams of crack cocaine.  (Id. at 142.)  Both the informant and the undercover were wearing recording devices.  (Id.)  Before leaving for the buy location, the confidential informant was searched for contraband, including drugs, and the agent made note of any money that he

had on him to be sure that he was neither bringing the drugs to the sale or taking anything back with him.  (Id. at 143.)  The sale was to take place in the vicinity of Henry Franklin's residence.  (Id. at 144.)  During the sale, Agent DiGirolamo was in his vehicle on Jerome Avenue, listening to transmissions from the undercover officer's Kel transmitter.  (Id.)  Over the undercover officer's Kel transmitter, Agent Digirolamo was able to hear the undercover officer counting money.  (Id.)  After the sale was completed, the undercover and Agent Digirolamo reunited at the precinct.  (Id. at 144.)  The informant was not present.  (Id.)  At the precinct, Agent Digirolamo saw that undercover officer Patrick had obtained a quantity of crack cocaine.  (Id. at 145.)

On cross-examination, Agent Digirolamo explained that in addition to the payments made by ATF to the confidential informant, the informant had been paid relocation expenses of about $5,000.  (Id. at 155.)  In addition, Agent Digirolamo testified that the informant received about $2,000 from the U.S. Attorney's office for his relocation.  (Id.)

Agent Digirolamo testified on cross examination that the original buy location for the March 13 narcotics purchase was 1705 Andrews in the Bronx, but because the drugs were not at that location the team had to drive to 175 Eastburn in order to complete the sale.  (Id. at 165.)  Agent DiGirolamo also explained that, during a controlled buy, after the informant is searched, the informant and the undercover get into the car together and are not within eyesight of any of the other officers.  (Id. at 173.)  Agent Digirolamo also testified that there was no digital recording made by the confidential informant during the March 13, 2008 sale, and that the undercover agent was not with the confidential informant during the entire March 13 transaction.  (Id. at 179.)  After listening to a

portion of the Kel recording from March 13 outside the presence of the jury, Agent
Digirolamo testified that, on the tape made by the Kel device of the March 13 sale, one
can hear money being counted twice.  (Id. at 180-181.)  He testified that he was not
present and listening during the incident captured by the recording when the money is
heard being counted for the first time.  (Id. at 181.)  Defendant's counsel inquired as to
whether that was because the undercover was giving the informant the money to handle
the transaction on his own.  (Id.)  Agent Digirolamo testified that he does not know why
the money was counted twice.  (Id.)  He testified that the plan for this operation was for
the undercover to make the purchase, rather than the informant.  (Id.)

With regard to the March 20 sale, Agent Digirolamo testified that at times the
confidential informant was outside the presence of any member of the law enforcement
team.  (Id. at 182.)

On redirect, Agent Digirolamo testified that prior to providing an informant with
"buy money" to purchase drugs, he makes a record of the serial numbers on the money so
that in the event there is a robbery, or if the informant has received a kick back, the
money would be marked.  (Id. at 189.)  On re-cross Agent Digirolamo testified that at the
time of his arrest in 2009, Henry Franklin was not found to be carrying any marked
money.  (Id. at 193.)

C.  Testimony of Michael Patrick

The next witness was the undercover officer Michael Patrick, who is employed by
the ATF.  (Id. at 194.)

i.      March 13, 2008

Agent Patrick testified that on March 13, 2008, he was assigned to act as an undercover and purchase 100 grams of cocaine from a target in the Bronx.  (Id. at 198.) This purchase was to take place near 1705 Andrews Avenue in the Bronx.  (Id.)  He explained that during this transaction he was wearing a Kel recording device.  (Id. at 200.)  Agent Patrick testified that the informant's role in the March 13 investigation was to coordinate the sale and introduce him to the targets of the case.  (Id. at 201.)

At about 11 a.m. on March 13, 2008, Agent Patrick drove his car to the buy location at 1705 Andrews Avenue.  (Id.)  The informant was in the front passenger seat. (Id.)  Upon arrival, Agent Patrick parked the car, and the informant exited the car to enter the building.  (Id. at 202.)  The informant was inside the building for 15-20 minutes.  (Id.) Then, the informant exited the building with two other men.  (Id. at 203.)  After talking on the sidewalk for a few minutes, the informant and the two other men entered the car, with the informant in the front passenger seat and the two other men in the rear seat.  (Id.) Agent Patrick testified that the informant told him that one of the men in the back seat was "BT." (Id. at 203-204.)  Agent Patrick identified the Defendant in court as the person identified by the informant as BT on March 13.  (Id. at 204.)   Agent Patrick testified that the Defendant told him that the drugs they were to purchase had been moved to another location, and provided directions on how to drive to the other location.  (Id. at 205.)  The drive between locations took about fifteen minutes.  (Id. at 207.)  On the Kel recording of the sale on March 13, the Defendant enters the car and begins giving directions to Eastburn and 175th, across the Concourse. (Govt. Ex. 202A-T at 3.)  Then Agent Patrick asks "Yo, BT, this thing won't take long, right?" and the Defendant responds "Nah, nah,

nah.  The stuff that take long was the dude had to come from Harlem.  I just finished last

night.  [U/I] finished last night.  We'd have been done right now."  (Id.)  Agent Patrick

then asks, "He's waiting now, right?" and the Defendant replies "Yeah, yeah."  The

Defendant then asks "The whole hundred, right?" and the informant replies, "yeah, the

whole hundred," to which the Defendant responds "Trying to get me out, I'm telling

you."  (Id.)

        Then, the following conversation occurs:

| | |
|---|---|
| PATRICK: | I don't want to hang around, alright?  I got shit I got to do.  You know what I'm saying?  I thought you'd be right here, that's why I came right over here. |
| BT: | Nah, it would have been here |
| PATRICK: | Mmhmm |
| BT: | But he, he ran out of what he had. |
| PATRICK: | Mmhmm |
| BT: | You know what I mean, usually, usually when you come it would be right here. |

(Id. at 4.)

        About twelve minutes later, the car pulled up to the second location, and

the following conversation took place:

| | |
|---|---|
| PATRICK: | Yo, yo BT.  Can I ask you a question?  BT, cut me a break, man, in the price.  Like, like, like, three g? |
| BT: | The thing is…for the moment… |
| PATRICK: | You know what I'm saying?  I'm buying [U/I] Cut me a break, you know what I'm saying?  [U/I]  I asked you man, you know what I'm saying? |
| BT: | Yeah |
| … | |
| BT: | Hey yo.  You want to come try to talk the number down for him?  Real quick? |
| INFORMANT: | Yeah |

(Id. at 6.)

Once they arrived at the second location, Agent Patrick parked the car, and the

informant and BT exited and walked up the block, while the other man stayed in the car.

(Trial Tr. at 207.)  Agent Patrick and the remaining man, who Agent Patrick later

identified as "Dada," (id. at 216) spoke about drug prices while they waited:

| | |
|---|---|
| PATRICK: | Give, give me a good deal, you know what I'm saying? |
| DADA: | Shit is hot right now, yo. |
| PATRICK: | I know man.  That's what I was saying. |
| DADA: | Shit is bananas right here. |
| PATRICK: | Yeah.  So I'm going to give him what? What, 32? |
| DADA: | Yeah. |
| … | |
| DADA: | Yeah you got motherfuckers, getting it and selling it for thirty-three, thirty-four. |

(Id. at 7-8.)

Agent Patrick testified that he understood this to refer to different prices for crack

cocaine.  (Tr. at 229.)

After that, the following conversation takes place:

| | |
|---|---|
| PATRICK: | Yeah man, I don't want to come so far, you know what I'm saying. |
| DADA: | Yeah, it's just that what he had, he ran out. |
| PATRICK: | Yeah I know you were saying that. |
| DADA: | Yeah, he ran out.  So he had to come.  You know what I mean. |

(Govt. Ex. 202A-T at 9.)

Agent Patrick testified that he understood Dada to mean that BT ran out of the

"crack cocaine or cocaine that [Agent Patrick] was trying to buy," and that was the reason

for their driving to the second location.  (Trial Tr. at 229-30.)  Agent Patrick understood

Dada's use of "he" to refer to BT.  (Id. at 230).  Later, after the informant and BT

returned to the car, (id.) the undercover officer and BT begin to discuss prices:

| | |
|---|---|
| PATRICK: | You talk about the price? |
| BT: | I don't know if he's going to do it. |
| PATRICK: | Alright.  Thirty, thirty, thirty-one or thirty-two?  You know what I'm saying? |
| BT: | Thirty-one. |
| PATRICK: | Thirty one? |
| BT: | Thirty one. |
| PATRICK: | Thirty-one?  Alright.  I'd like this to be a, an, in and out thing. |
| BT: | Yeah, in and out.  He's just talking to us real quick.  Yeah right now. |

(Govt. Ex. 202A-T at 9-10.)

Agent Patrick testified that he was haggling on prices, and that he and BT came to an agreement that he would pay $3,100 for the cocaine.  (Tr. at 230-31.)  The conversation then continued:

| | |
|---|---|
| BT: | You see what happened, I usually have it.  I usually. |
| PATRICK: | Hell yeah |
| BT: | I usually have it.  I usually have it on my side.  So, you know, I ran out.  We had to come over here. |

(Govt. Ex. 202A-T at 10.)

Agent Patrick testified that he understood this to mean that normally, the hundred grams of cocaine would be at 1705 Andrews Avenue as opposed to Eastburn and 175 where they were. (Tr. at 232.)

BT, Dada and the informant then left the car and returned about five minutes later. (Tr. at 208; 233.)  Agent Patrick watched as BT threw a plastic bag of cocaine into the car through the passenger window and onto the seat. (Id. at 208.)  BT then got in the car and sat in the backseat behind the informant.  (Id.)  The next conversation between BT and Agent Patrick captured on the recording includes the following statements:

| | |
|---|---|
| BT: | You got the money alright?  Sup brother? |

PATRICK:            Hell yeah, BT?

(Govt. Ex. 202A-T at 11.)

Agent Patrick then picked up the drugs and examined them.  (Trial Tr. at 208.)

Agent Patrick counted out $3,100; he gave the first $1,000 to BT, and the rest to Dada

who was seated in the backseat.  (Id. at 209.)  BT and the Dada then exited the car, and

Agent Patrick and the informant drove away.  (Id. at 210.)

After the purchase, Agent Patrick gave the drugs to Agent Digirolamo, who was

the case agent. (Id. at 211.)  Agent Patrick also identified Henry Franklin from a

photograph given to him by Agent Digirolamo.  (Id.)

ii.    March 20, 2008

On March 20, 2008, Agent Patrick again served as the undercover officer for a

controlled buy of narcotics arranged by the confidential informant.  (Tr. at 243.)  Once

again, his assignment was to travel with the informant to the vicinity of East 170th Street

and Townsend Avenue to buy approximately 100 grams of crack cocaine.  (Id.)  Agent

Patrick was wearing a Kel audio device during this transaction.  (Id. at 244.)

Around noon that day, Agent Patrick and the informant drove to the location of

170th Street and Townsend Avenue.  (Id. at 246.)  While they were driving, the informant

was speaking with BT on his cell phone to ask what time BT would arrive to sell the

crack cocaine.  (Id. at 246-47; Govt. Ex. 204A-T at 2.)  Agent Patrick was able to hear

both sides of the conversation over the speaker phone.  (Trial Tr. at 247.)

When they arrived at the location, Agent Patrick parked his vehicle at the Munch

Time coffee shop.  (Id. at 248.)  While waiting for BT at Munch Time, Agent Patrick

spoke to BT over the informant's cell phone and stated:

PATRICK:            My brother, yo man.  You told me, you told me twenty-
                    nine man.  We, we do it for that?

16

| | |
|---|---|
| BT: | What you say? |
| PATRICK: | I thought, I thought you told, you told him twenty-nine. |
| … | |
| BT: | There's different people from last time. |
| PATRICK: | Alright, alright, so, so, I got to bring three, huh? |
| BT: | Same thing as last time.  I couldn't work you a deal because [U/I]. |
| … | |
| BT: | Yeah we just got somebody else's shit, somebody else's shit.  Nigger have to…So [U/I].  Once he put it on the fire, you know, he's gotta take it off. |
| PATRICK: | I, I got to wait?  How long?  How long I gotta wait for? |
| BT: | Yeah, we just waiting on the cab. |

(Govt. Ex. 204A-T at 2-3.)

Agent Patrick then waited in the vehicle while the confidential informant went into Munch Time.  (Id. at 4-5.)  The informant got out of the car at about 1:00 p.m. and went into Munch Time.  (Id. at 249; Govt. Ex. 204A-T at 4.)  At about 2:30 in the afternoon, the informant and BT exited Munch Time and got into the car.  (Id. at 249-250.)  The informant sat in the passenger seat next to Agent Patrick and BT sat behind the informant.  (Id. at 250.)

| | |
|---|---|
| PATRICK: | BT, what's up, man? |
| BT: | What up? |
| PATRICK: | My brother, two and a half hours later, man. |
| BT: | I've been up since [U/I] |
| PATRICK: | Yeah? |
| BT: | I've been up since 8 for this shit. |
| PATRICK: | Yeah. |
| INFORMANT: | Tell him [U/I], because he wanted [U/I] crack. |
| PATRICK: | Last time you gave me, you gave me some shit, BT.  That shit wasn't what I wanted man. |
| BT: | I know, it's cooked. |

| PATRICK: | Yeah cool.  I know, I know.  It looks like it and smells like it.  I could smell it.  Yeah brother, that's it.  That's it…Hold on.  Hold on.  Hold on.  Twenty-nine? [laughter] |
| BT: | If we went back to my niggers again… |
| PATRICK: | Yeah. |
| BT: | I could have.  I could have got you a better deal.  You know what I'm saying? |

(Govt. Ex. 204A-T at 6-7.)

Then, Agent Patrick paid BT $3,000 and the Defendant provided him with the crack in a transparent plastic bag.  (Govt. Ex. 204A-T at 7.)  Agent Patrick testified that the Defendant recounted the money and put it into his pocket.  (Trial Tr. at 252.)

On cross examination, Agent Patrick testified that he intended to buy drugs on March 13 from BT or "H," but "ended up buying from BT." (Id. at 306.)  Agent Patrick also explained on cross examination that at the end of the March 13 transaction, he gave some of the $3,100 to BT and some to Dada "because they both came to the car."  (Id. at 312.)  Agent Patrick testified on cross that on March 13, after BT and the informant went into the building, but before they returned to the car, a man in a red leather coat exited from the building.  (Id. at 320.)  At the time he saw the man, the informant had come back to the car, but BT was not in the car.  (Id. at 321.)  Agent Patrick described this man on the Kel recording device.  (Id. at 322.)  In that description, he indicated that it appeared that this man was "running the whole show."  (Id. at 321.)

Defense counsel, referencing the portion of the Kel recording in which Agent Patrick describes the man in the red coat, questioned the witness regarding when exactly Dada was in the car, suggesting that that the undercover was talking into his recorder while Dada could hear him.  (Id. at 323.)  Agent Patrick initially did not seem to understand the significance of this question, but once he did, he stated that Dada could

not have been in the car.   (<u>Id.</u> at 324.)  Defense counsel also played the portion of the

transcript at the end of the March 13 transaction during which Agent Patrick can be heard

complaining that the drugs were not crack to the confidential informant, apparently

outside the presence of the Defendant and Dada. (<u>Id.</u> at 329.)  Defense asked "isn't it a

fact that the confidential informant had the cocaine in his possession and handed it to you

only after you drove away?"  to which Agent Patrick replied, "No, that never happened."

(<u>Id.</u>)

     Also on cross examination, the defense played an portion of the March 20 digital

recording made by the confidential informant's device, which was not transcribed.  (<u>Id.</u> at

342.)

| | |
|---|---|
| BRILL: | Agent Patrick, do you know who Tutu is? |
| PATRICK: | No. |
| BRILL: | Did you understand what the confidential informant was telling you when he was saying the idiot Tutu was making deliveries? |
| PATRICK: | I understand, but I don't know who Tutu is. |
| BRILL: | Did you have information that based upon that, that someone other than Henry Franklin was making the delivery of the drugs? |
| PATRICK: | But my understanding was that Tutu was delivering the drugs to BT in Munch Time.  That's my understanding. |

 (<u>Id.</u>  at 342.)

     Next, defense counsel played another portion of the digital recording made by the

confidential informant, which was not transcribed.  (<u>Id.</u> at 343-344.)  Agent Patrick

testified that the recording sounded as though the confidential informant was inside the

Munch Time diner.  (<u>Id.</u> at 344.)  Defense counsel then asked:

| | |
|---|---|
| BRILL: | Isn't it a fact that your [confidential informant] had the money and did that drug deal in the bathroom of Much Time? |

| | |
|---|---|
| PATRICK: | heck no.  I would never allow any informant to go anywhere with $3,000.  I normally make it a rule where I go on transactions if I'm the undercover on the case.  That never happen. |
| BRILL: | There's no drug deal in that bathroom? |
| PATRICK: | Drug deal?  You mean the guy Tutu transferred the drugs?  I wasn't there when that happened.  I have no idea what happened.  All I know is that they both came to the car, I paid BT the money to give me the drugs. |

(<u>Id.</u> at 346.)

Defense counsel then played the portion of the March 20 recording in Agent

Patrick counts out the money in BT's presence.  (Govt. Ex. 204A-T at 7.)

| | |
|---|---|
| BRILL: | Comparing the March 13 recording to the March 20 recording, it sounds in this recording that Mr. Franklin was significantly softer.  Isn't that because he was actually having that conversation with you through the window of the car? |
| PATRICK: | No, you're absolutely wrong counselor.  He got to the car.  I would never count money—it's hard to count money on the street like that. |

(<u>Id.</u> at 347.)

    D.  <u>Testimony of Harrison Brown</u>

Harrison Brown, or "H," testified for the Defendant.  Mr. Brown had already pled

guilty to conspiracy charges related to drug distribution.  He was asked the following

questions:

| | |
|---|---|
| BRILL: | Before you were arrested and brought to court on the case for which you pled guilty, had you ever met Henry Franklin? |
| BROWN: | No, sir. |
| BRILL: | Had you ever, to your knowledge, done business with Henry Franklin? |
| BROWN: | No, sir |
| BRILL: | Had you ever—had any of your associates or people that you did business with, to your knowledge, ever do business with Henry Franklin? |
| BROWN: | No, sir. |

| BRILL: | Did you ever do business with someone with the nickname BT? |
|---|---|
| BROWN: | No, sir. |
| BRILL: | And again, did anyone that you do business with or you associated with, to your knowledge, do any business with a person named BT? |
| BROWN: | No, sir. |
| BRILL: | Were there times prior to your arrest that people referred to you as H? |
| BROWN: | Yes. |

(Id. at 386-87.)

On cross-examination, Mr. Brown acknowledged that he did not sell drugs alone, but worked with others in order to distribute narcotics.  (Id. at 397.)

## DISCUSSION

I.      The Inconsistencies of the Jury Verdict

Defendant contends that the jury's finding Mr. Franklin guilty of a conspiracy to distribute or of possession with intent to distribute narcotics, including 50 grams or more of crack cocaine, is inconsistent with their acquittal of Mr. Franklin on the counts of distribution or possession with intent to distribute cocaine and distribution or possession with intent to distribute crack cocaine.

Defendant's contention that an apparent inconsistency in the jury verdict entitles him to a judgment of acquittal, or a new trial, is contrary to established precedent.  "It has long been established that inconsistency in jury verdicts of guilty on some counts and not guilty on others is not a ground for reversal of the verdicts of guilty."  United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994).  This is because "[e]ach count in an indictment is regarded as if it was a separate indictment….That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible.  But verdicts cannot be

upset by speculation or inquiry into such matters." <u>Dunn v. United States</u>, 284 U.S. 390, 393-394 (1932).  <u>See also</u> <u>United States v. Powell</u>, 469 U.S. 57, 63 (1984).

Thus, even assuming that the jury's verdict is inconsistent, it may not be disturbed by the Court's speculation into how it was reached.

II.    <u>Overt Acts and Sufficiency of the Evidence</u>

Next, the Defendant argues that Mr. Franklin is entitled to a judgment of acquittal or a new trial because he was acquitted on both of the substantive counts of the indictment charging him with 1) sale or possession with intent to sell cocaine on March 13 and 2) sale or possession with intent to sell crack cocaine on March 20.  Defendant contends that because the Government introduced no evidence other than those two substantive counts as overt acts of the conspiracy, Mr. Franklin's conviction on the conspiracy count cannot stand.

The Indictment charged Mr. Franklin with conspiracy to violate the narcotics laws pursuant to 21 U.S.C. § 846.  Under Section 846, it is not necessary for the Government to allege or prove even one overt act. <u>See</u> <u>United States v. Shabani</u>, 115 S.Ct. 382, 385 (1994) (Government need not prove commission of any overt acts in furtherance of conspiracy in violation of section 846); <u>United States v. Story</u>, 891 F.2d 988, 992 (2d Cir. 1989) ("The only elements of a section 846 narcotics conspiracy offense are the existence of a conspiracy and defendant's willful joining it.").

Defendant's motion amounts to a challenge to the sufficiency of the evidence underlying the conspiracy charge: "if the substantive charges were not proven beyond a reasonable doubt, and there was no other evidence supporting the conspiracy, then how could the conspiracy count have been proven beyond a reasonable doubt if all charges

relied on the same evidence?"  (Def.'s Mem. in Supp. at 4.)  As stated above, the only elements of a section 846 narcotics conspiracy offense are the existence of a conspiracy and defendant's willfully joining it.  United States v. Story, 891 F.2d at 992.  The evidence presented at trial was sufficient for a jury to find that a conspiracy to distribute crack cocaine existed and that Defendant willfully joined it.

"[S]ufficiency of the evidence is reviewed independently for each count, ignoring the jury's determination that evidence on another count was insufficient."  United States v. Jespersen, 65 F.3d 993, 998 (2d Cir. 1995) (internal quotations omitted).  In evaluating the sufficiency of trial evidence on a Rule 29 motion, evidence must be viewed in the light most favorable to the prosecution.  United States v. Gonzalez, 110 F.3d 936, 940 (2d Cir. 1997).  "A court may enter judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004).

On March 13, 2011, the confidential informant arranged a drug deal by a phone call to "H."  (Tr. at 34; Govt. Ex. 201-T at 1.)  Agent La Mazza was familiar with "H's" voice from previous interactions and identified him as the speaker.  (Trial Tr. at 39.)  Agent Digirolamo testified that he interviewed "H" following his arrest and reviewed the recordings of the calls made to "H" and concluded that the speaker on the calls was in fact "H."  (Id. at 130-31.)  Special Agent Michael Patrick drove himself and the confidential informant to the buy location at 1705 Andrews Avenue, in the Bronx.  (Tr. at 46.)  The informant went inside the building and emerged with the Defendant, who then entered the car.  (Id. at 203.) On the recording of that day's events, the Defendant can be

heard directing Agent Patrick how to drive from 1705 Andrews Avenue to a new location.  (Govt. Ex. 202A-t at 3.)  Agent Patrick then asks "this thing won't take long, right?" and the Defendant responds "Nah, nah, nah.  The stuff that take long was the dude had to come from Harlem.  I just finished last night."  (Id.)  Patrick asks "He's he's waiting now, right?" and the Defendant replies, "Yeah, yeah."  (Id.)  The Defendant then explains that the drugs would have been "here" but that he "ran out of what he had."  (Id. at 3-4.)  Defendant then asks Agent Patrick "the whole hundred, right?" and the informant replies, "Yeah, the whole hundred," apparently referring to the 100 grams of crack cocaine that Agent Patrick was expecting to buy  (Id. at 3.)  Defendant then says "Trying to get me out.  I'm telling you."  (Id. at 4.)  This conversation indicates that the Defendant had been in touch with a supplier from Harlem, from whom he was going to obtain the narcotics.  The Defendant's statement that the drugs would have been here but "he ran out of what he had," indicates that his normal supplier had run out of narcotics.

When the car arrives at the new location, Defendant can be heard on the recording saying "I'm right in front of the building," after a noise that sounds like the beep of a two-way phone.  (Id. at 6.) Defendant then negotiates the price with Agent Patrick, agreeing to sell the drugs for $3,100.  (Id. at 6, 10.)  Defendant next explains that "I usually have it…I usually have it on my side.  So, you know, I ran out.  We had to come over here."  (Id. at 10.)  Defendant then leaves the car and enters a building, and when he returns minutes later, Agent Patrick testified, he threw a plastic bag of powder cocaine onto the passenger seat of the car through the open window and asks Agent Patrick "You got the money already?"  (Trial Tr. at 208; Govt. Ex. 202A-T at 11.)  Agent Patrick then paid BT and Dada $3,100.  (Tr. at 208-09.)

24

On March 20, 2011 Michael Patrick, the undercover agent, purchased nearly 100 grams of crack cocaine. (<u>Id.</u> at 63.) Again, the transaction was initiated by a phone conversation between the confidential informant and H.  (<u>Id.</u> at 58.)  On the recording of this phone call, the informant asks "H" whether he talked to BT, and "H" replies "Yeah, I was just talking to him earlier."  (Govt. Ex. 203-T at 1.)  Agent Patrick and the informant then drove to East 170th Street and Townsend Avenue.  (Tr. at 246.)  The March 20 recording captures a conversation between Agent Patrick and BT that occurred while Agent Patrick and the informant were waiting for the Defendant at the Munch Time diner located at that location.  (Govt. Ex. 204A-T at 3.)  On this recording, the Defendant can again be heard negotiating prices with the Defendant, agreeing on a price of $3,000 and explaining that "there's different people from last time...Yeah, we just got somebody else's shit."  (Govt. Ex. 204A-T at 3.)

When BT arrived at Munch Time, he gets into the car with Agent Patrick, and through the Kel recording a conversation can be heard during which Agent Patrick states "last time you gave me, you gave me some shit, BT.  That shit wasn't what I wanted man." and the Defendant replies "I know, this time it's cooked."  (<u>Id.</u> at 6-7.) This exchange demonstrates the Defendant's knowledge that this time, crack cocaine was to be provided to the agent, instead of powder cocaine.  Then, Agent Patrick tries again to bargain on the price, and the Defendant states, "if we went back to my niggers again…I could have.  I could have got you a better deal.  You know what I'm saying?"  (<u>Id.</u> at 7.) Agent Patrick testified that he then obtained crack cocaine from BT and paid him $3,000. (Tr. at 252.)

The evidence presented at trial was sufficient for the jury to find that a conspiracy to sell drugs existed, and that the Defendant willfully joined it.  In conjunction with the March 13 sale, the Defendant directed Agent Patrick from one location to another, because the first location no longer housed the drugs.  He then negotiated prices with Agent Patrick, and indicated that other people were involved in the transaction, stating "I don't know if he's going to do it" in response to Agent Patrick's attempts to bargain on price.  (Govt. Ex. 202A-T at 9-10.)  As Agent Patrick testified, the Defendant provided the cocaine and accepted payment.  On March 20, the Defendant acknowledged that when he previously sold drugs to Agent Patrick, he did not provide crack cocaine as requested, but that this time the drugs would be "cooked."  (Govt. Ex. 204A-T at 6-7.)  He refers to the other people he worked with explaining "we just got somebody else's shit," and that "if we went back to my niggers again…I could have got you a better deal." (Govt. Ex. 204A-T at 3, 6-7.)  A reasonable jury could conclude that these statements prove that Defendant was a willing participant in a scheme to work with others to sell drugs.

III.    The Buyer Seller Rule

Defendant contends that the evidence presented at trial established only that Mr. Franklin helped a willing buyer make contact with a willing seller, and that therefore a charge of conspiracy cannot be established under United States v. Hyoshion, 448 F.2d 343 (2d Cir. 1971) and United States v. Tyler, 758 F.2d 66 (2d Cir. 1985) which held that merely helping a willing buyer make contact with a willing seller does not necessarily establish the existence of an agreement.  Id. at 347.  Neither of these cases render the conviction in this case invalid.

First, Hyoshion and Tyler are outdated, because they predate United States v. Shabani, 115 S.Ct. 382, 385 (1994), which established that an overt act is not necessary to prove a conspiracy pursuant to Section 846.  Furthermore, Hyoshion and Tyler stand for the proposition that the fact that a defendant tells a willing buyer how to make contact with a willing seller does not necessarily imply that there was an agreement between that seller and the defendant to engage in illegal activity.  In Hyoshion, the defendant, Rimbaud, served as a liaison between an informant seeking to purchase drugs and a supplier by putting the two in contact.  448 F.2d at 346.  The court in that case found that Rimbaud was a "mere casual facilitator," and therefore found that Rimbaud's conviction on the conspiracy count must be overturned.  Id. at 346-47.  In Tyler, an undercover officer expressed an interest in buying heroin from the defendant, who then walked down the street with the officer and spoke briefly with various individuals, one of whom then approached the undercover officer and sold him drugs.  758 F.2d 66, 67.  There was no evidence presented that the defendant was working together with the seller, as opposed to a person trying to be helpful to the buyer, or a "mere facilitator."  Id. at 69.

Here, in contrast, the evidence demonstrates that Mr. Franklin did more than help the undercover make contact with a willing seller.  There was evidence that the purchases on March 13 and 20 were arranged by the confidential informant based on communication with H.  On March 13, upon the undercover agent's arrival at the pre-arranged buy location on March 13, the Defendant entered the undercover agent's car, and directed the agent to a new location to pick up the drugs, explaining that he had "ran out," and that was why the officer had to drive to a second location.  Mr. Franklin then negotiated prices with the undercover, and evidence was presented that he both delivered

the drugs to the undercover and, along with Dada, accepted payment.  On March 20, Mr. Franklin explained that the cocaine provided this time would be "cooked," or turned into crack, which in conjunction with the eventual delivery of crack cocaine gives rise to a reasonable inference that the Defendant was in communication with the supplier of the crack cocaine and knew what was being prepared.  Mr. Franklin also acknowledged that "this time" crack would be provided, indicating that he was aware of what type of drugs were sold last time, i.e. on March 13.  On March 20, Mr. Franklin again negotiated prices with the undercover agent, and indicated that he could get him a lower price if they had bought from his usual source, demonstrating that he was working with others to sell the crack cocaine.  Evidence was presented that on March 20 Mr. Franklin delivered the drugs and accepted payment.

Thus, sufficient evidence was presented at trial that could lead a reasonable jury to conclude that Mr. Franklin was more than just a mere facilitator, but rather an active participant in the conspiracy to sell cocaine and/or crack cocaine.

## CONCLUSION

The evidence presented at trial was sufficient for a reasonable jury to convict Mr. Franklin on the conspiracy count, and the jury's decision to acquit on the other two counts does not affect the legitimacy of their verdict.  Defendant's motions pursuant to Rule 29 and Rule 33 for a judgment of acquittal or a new trial are hereby denied.

IT IS SO ORDERED.

Dated:  New York, New York
          April __, 2011

_____

Robert P. Patterson, Jr.

U.S.D.J.

**Copies of this Order were faxed to:**

Jason Andrew Masimore
Justin A. Anderson
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2580
Fax: (212) 637-2527


Peter E. Brill
Karasyk & Moschella, LLP
225 Broadway, 32nd Floor
New York, NY 10007
(212)-233-3800
Fax: (212)-233-3801